IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Linda Snider,<br><br>　　　　　　　　Plaintiff,<br><br>　vs.<br><br>Carolyn W. Colvin, Acting<br>Commissioner of Social Security,<br><br>　　　　　　　　Defendant. | Civil Action No. 6:14-2585-RMG-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits ("DIB") on October 14, 2011, alleging that she became unable to work on February 28, 2009. The application was denied initially and on reconsideration by the Social Security Administration. On August 20, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and G. Roy Sumpter, an impartial vocational expert, appeared on March 21, 2013, considered the case *de novo* and, on June 25, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the

Appeals Council denied the plaintiff's request for review on April 30, 2014. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act on December 31, 2014.

(2)    The claimant has not engaged in substantial gainful activity since February 28, 2009, the alleged onset date (20 C.F.R §§ 404.1571 *et seq*).

(3)    The claimant had the following severe impairments: lumbar degenerative disc disease (DDD), status post left rotator cuff repair times two, non-obstructive coronary disease (pacemaker), and obesity (20 C.F.R. § 404.1520(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R §§ 404.1567(a).

(6)    The claimant is capable of performing past relevant work as an accounts receivable (sedentary/SVP 5); tax work (sedentary/SVP 4); and billing clerk (sedentary/SVP 4). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

(7)    The claimant has not been under a disability, as defined in the Social Security Act, from February 28, 2009, through the date of this decision (20 C.F.R. § 404.1520(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

2

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. § 404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff

3

can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 58 years old on her alleged disability onset date and 62 years old on the date of the ALJ's decision. She had a high school diploma and attended junior

4

college (Tr. 34). She has past relevant work as an accounts receivable clerk, tax preparer, billing clerk, and insurance agent (Tr. 45).

The plaintiff received a pacemaker in 1997 (Tr. 433-36), and has been diagnosed with atrial fibrillation. She received periodic cardiac follow-up and pacemaker battery replacements through Cardiology Consultants, P.A. (Tr. 365-93, 437, 523-67).

On January 6, 2009, the plaintiff had lumbar spine x-rays that showed mild degenerative change (Tr. 503).

On March 10, 2009, the plaintiff was seen at Mountain View Family Practice for headaches and fatigue. The plaintiff also reported that her heart had been racing, and she was having lightheadedness on and off. It was noted that the plaintiff had a stressful job and worked long hours but had missed some time from work due to her symptoms (Tr. 316-17). On August 3, 2009, the plaintiff reported concern that her diabetes medications were causing weight gain (Tr. 315-16). On August 25, 2009, the plaintiff had minor swelling and pain in her left foot and was seen for the foot pain and diabetes follow-up. The plaintiff reported restarting Duetact due to increased blood sugars. The plaintiff was noted to have 1+ edema in her left ankle (Tr. 313-14).

On October 19, 2009, the plaintiff was seen at Mountain View Family Practice for left shoulder pain and low back pain. It was noted that the plaintiff had been suffering low back pain for over a year, but had progressively worsened to the point that she was significantly worse when standing more than five minutes at one time. The plaintiff reported that her pain was seriously impacting her quality of life. The plaintiff reported that her left shoulder problems had been present for two months. She had significantly decreased range of motion but no radiation of pain or loss of strength. It was noted that the plaintiff's blood sugars were better after switching her medication (Tr. 312-13). The plaintiff also had x-rays of her left shoulder, which showed hypertrophic degenerative changes of the

5

acromioclavicular joint that could have been causing impingement syndrome, and x-rays of her lumbar spine, which showed mild scoliosis and degenerative changes (335-36).

On November 24, 2009, the plaintiff had a coronary CT angiography, which showed mild to moderate non-obstructive coronary plaque (Tr. 350-52).

On November 30, 2009, the plaintiff saw Marco A. Rodriguez, M.D., of Orthopedic Specialties of Spartanburg, for back pain (Tr. 286-87). The plaintiff said she was in a car accident many years prior that caused increased low back pain over the last several years. She indicated that she had constant pain when she stood for longer than ten to fifteen minutes and that walking made the pain worse. She estimated that she could walk less then one block. The pain also interfered with her sleep. On examination, the plaintiff ambulated well and was able to walk on her heels and toes (Tr. 287). Her low back was tender and she had pain on extension, but when she flexed forward, she noticed no change in her pain. She had full sensation and strength in her legs. She had no re-creation of her back pain or leg pain with a straight leg raise or hip rotation. She had some left shoulder impingement. Her lumbar spine x-rays showed no instability on flexion and extension and loss of height between L2-S1. Dr. Rodriguez noted that she also had diarrhea, shoulder pain, shortness of breath, easy bruising, and was on blood thinners. She weighed 268 pounds and was 5'5" tall, which made her body mass index ("BMI") 47. Dr. Rodriguez ordered a discogram and follow-up CT and sent her for physical therapy for her left shoulder. She was prescribed Mobic and Ultram for pain. The doctor noted that she did not want to take Lortab because it made her feel "loopy." He also noted that she was going on a cruise from December 18 through early January (Tr. 286-87).

On January 12, 2010, the plaintiff saw Marla Johnson, P.A., at Mountain View Family Practice for cold symptoms and left foot pain and swelling after long periods of standing/walking (Tr. 328). She denied having diarrhea (Tr. 329). On musculoskeletal examination, the plaintiff had mild swelling with nodules around her left heel and was tender

6

to touch. She had had heel spurs several years prior. The plaintiff had decreased range of motion and strength of her left shoulder, but her gait was normal. Ms. Johnson assessed lumbar degenerative disc disease, foot pain, and shoulder pain (Tr. 328). She prescribed pain medication for the plaintiff's back, referred the plaintiff to a podiatrist, and encouraged her to attend physical therapy for her shoulder (Tr. 329). On February 3, 2010, the plaintiff had a podiatry consultation for left foot pain. X-rays showed a significant amount of exostosis and spur formation. She was given heel lifts and advised to do home stretching exercises (Tr. 261).

On February 25, 2010, the plaintiff saw Stephen M. Kana, M.D., of Orthopedic Specialists of Spartanburg, for left shoulder pain (Tr. 282-83). She reported that she fell over a lawn mower in December 2009, which caused her shoulder pain that had worsened over time. She indicated that she had limited mobility and was having difficulty using her shoulder (Tr. 282). On left shoulder examination, the plaintiff was tender/weak in the supraspinatus portion of the rotator cuff, but she had good strength in the infraspinatus and good grip strength. Her left shoulder range of motion showed 70-80 degrees of abduction with 0 degrees of rotation. Dr. Kana indicated that x-rays showed a type III acromion with AC joint osteoarthritis. Dr. Kana's impression was a frozen shoulder and rotator cuff tear (Tr. 282-83). He manipulated the plaintiff's shoulder under anesthesia on March 8, 2010 (Tr. 268). On March 19, 2010, the plaintiff saw Roxanne Dingman, ATC, OPA-C, and reported that her range of motion in her shoulder was better than prior to surgery, and she felt that she was improving. She was encouraged to continue her exercises, and it was noted that she may still need an MRI to evaluate her rotator cuff. Dr. Kana noted, "She is going to Disney the following week and I have encouraged her to make sure that she has somebody with her that can stretch her every day" (Tr. 281). On April 8, 2010, the plaintiff reported that she still had pain during therapy, but she was "definitely better" than prior to surgery. Dr. Kana took x-rays and recommended continued physical therapy (Tr. 280).

At the plaintiff's April 29, 2010, diabetes consultation with Paige M. Gault, M.D., of Carolina's Center for Diabetes and Endocrinology, the plaintiff reported that she had a history of severe diarrhea during the time she took metformin (Tr. 308). Dr. Gault detailed the plaintiff's diabetes treatment history and noted that the plaintiff was presently taking Januvia and Actos because she could get them for free through patient assistance and samples. Dr. Gault noted that the plaintiff had occasional hypoglycemic episodes when she is more physically active than normal such as when she takes a young child to Dollywood. Dr. Gault diagnosed diabetes mellitus type II, controlled and recommended that the plaintiff continue on Januvia (Tr. 308-11).

On May 13, 2010, the plaintiff followed up with Dr. Kana and reported that her shoulder continued to do better, and her range of motion was "pretty much back to normal," but she continued to have pain at night and with overhead activity. The plaintiff had pain with forward flexion and abduction of the left arm and positive Neer and Hawkins signs. The plaintiff also had weakness in the supraspinatus portion of the rotator cuff and weakness of the infraspinatus. Dr. Kana gave her a cortisone injection (Tr. 279).

On June 10, 2010, Dr. Kana evaluated the plaintiff for follow-up of left shoulder pain. The plaintiff reported that she felt like she was improving but that she continued to have some pain. Dr. Kana continued the plaintiff's therapy program and scheduled to see her back in one month (Tr. 278).

On July 15, 2010, the plaintiff reported that "overall her pain is 200% better after the manipulation and the shot." Dr. Kana diagnosed status post adhesive capsulitis, resolving with continued impingement and rotator cuff tear. He was unable to get an MRI because the plaintiff has a pacemaker (Tr. 277-78).

On August 11, 2010, Dr. Gault reevaluated the plaintiff and continued her current medications (Tr. 302-04). On August 19, 2010, the plaintiff participated in a

8

diabetes education group (Tr.300-01). She participated in diabetic nutrition class on August 20, 2010 (Tr. 298-99).

On August 24, 2010, Ms. Johnson evaluated the plaintiff. The plaintiff reported that, due to costs, she had stopped one of her diabetes medications, and this greatly affected her blood sugar readings. Ms. Johnson reviewed and refilled the plaintiff's medications and started the plaintiff on Lomotil for irritable bowel syndrome (Tr.325-27).

On October 12, 2010, Dr. Kana evaluated the plaintiff for follow-up of left shoulder pain. He noted that the plaintiff had gotten her range of motion back but continued to have pain. The plaintiff also reported weakness with overhead activity. Dr. Kana indicated that the plaintiff had not gotten better despite cortisone injections and therapy. Dr. Kana diagnosed impingement syndrome and possible rotator cuff tear. Surgery was scheduled (Tr. 265-66).

On November 1, 2010, the plaintiff underwent an arthroscopy of her left shoulder and arthroscopic rotator cuff repair (Tr. 262-64). On November 9, 2010, Dr. Kana evaluated the plaintiff for surgical follow-up and removed the plaintiff's stitches. She was instructed to start physical therapy and to not actively lift her arm. Dr. Kana continued the plaintiff in a sling for three more weeks (Tr. 273).

On December 2, 2010, the plaintiff reported doing well overall. She continued to have a "good bit" of pain and indicated that therapy was very difficult for her. Dr. Kana indicated that they would wean the plaintiff out of her sling and continue physical therapy (Tr. 272).

The plaintiff saw Leanne Gottschalk, N.P., for diabetes follow-up on December 7, 2010. Ms. Gottschalk noted that the plaintiff had rotator cuff surgery the month prior and was having severe pain. The plaintiff's A1c was still acceptable and she reported that her blood sugars go down through the day. Ms. Gottschalk indicated that they would keep the plaintiff's treatment regimen the same and felt that the plaintiff's recent high

9

numbers were likely related to a stress response of the plaintiff's body to surgery and severe pain (Tr. 293-97).

The plaintiff followed up with Dr. Kana for her shoulder on January 18, 2011, and felt that her range of motion was "back to normal." Dr. Kana's impression was that she was doing well. The plaintiff continued to have some pain at the extreme forward flexion and abduction with mildly positive Neer and Hawkins signs. She also had some weakness in the supraspinatus portion of the rotator cuff. Dr. Kana continued the plaintiff's therapy (Tr. 271).

On March 31, 2011, on review of systems by Nurse Gottschalk, the plaintiff denied any gastrointestinal issues/changes in bowel habits (Tr. 290). The plaintiff's musculoskeletal examinations were normal, including full range of motion of all joints; she was neurologically intact with normal posture and gait; and she had normal reflexes, coordination, muscle strength, and tone (Tr. 291). The plaintiff's glycemic control had been good, and she was continued on her current treatment regimen (Tr. 288-92)

On May 13, 2011, the plaintiff saw Ms. Johnson for a kidney infection and reported that she quit her last job due to chronic diarrhea, and she also complained of chronic back pain (Tr. 321). The plaintiff reported that she had stopped working two years ago because of the diarrhea, which she had had for five or six years. The plaintiff said the back pain kept her from standing for more than several minutes at a time. The plaintiff reported that her husband was being forced to take early retirement, and she was very concerned about not having insurance. She indicated that she was going to be filing for disability. Ms. Johnson indicated that the plaintiff's other chronic medical conditions included type II diabetes mellitus, atrial fibrillation on Coumadin treatment, chronic Achilles tendonitis of the left foot, persistent insomnia, and a torn rotator cuff. Ms. Johnson stated that the plaintiff had been depressed and anxious due to recent developments in her life and was having many crying spells and anxiety attacks (Tr. 321-24). On examination, the

10

plaintiff's gait was normal (Tr. 322). Ms. Johnson prescribed Lomotil for the plaintiff's diarrhea and started her on Celexa and Ativan for depression and anxiety (Tr. 323).

On May 17, 2011, the plaintiff was hospitalized for replacement of her pacemaker (Tr. 357-59).

The plaintiff followed up with Dr. Gault for diabetes on July 11, 2011, and complained of back pain (Tr. 410). On examination, the plaintiff had a normal gait (Tr. 411). Dr. Gault recommended exercise as tolerated for the plaintiff's back pain (Tr. 412). The plaintiff reported that she had been under a great amount of stress because her younger brother had passed away. She reported elevated blood sugars. Dr. Gault added glimepiride to the plaintiff's medications (Tr. 409-12).

On July 25, 2011, Ms. Johnson completed a mental impairment questionnaire regarding the plaintiff at the Commissioner's request. Ms. Johnson indicated that the plaintiff had depression with anxiety and was being prescribed Celexa and Ativan. Ms. Johnson noted that she was unsure if these medications had been working and had not recommended psychiatric care. Ms. Johnson stated that the plaintiff was appropriately oriented; had intact thought process; appropriate thought content; worried, anxious, and depressed mood and affect; and good concentration and memory. Ms. Johnson noted that the plaintiff had no work-related limitation in function due to her mental impairments (Tr. 395).

The plaintiff established care with Erin Nash, M.D., of Family Physicians of Landrum, on October 14, 2011, complaining of diarrhea and anxiety (Tr. 493). On examination, the plaintiff's bowel sounds were positive, and her abdomen was soft and non-tender (Tr. 494). She had normal posture and gait (*id.*). Dr. Nash prescribed trazodone, fexofenadine, glimepiride, Crestor, citalopram, and lorazepam (Tr. 491-97).

On October 24, 2011, Dr. Gault reevaluated the plaintiff for continued uncontrolled blood sugar levels. Dr. Gault reviewed and adjusted the plaintiff's medications (Tr. 418-21).

On October 28, 2011, Dr. Nash reevaluated the plaintiff for back pain and urinary symptoms. She prescribed Lortab and ciprofloxacin (Tr. 487-90).

On March 13, 2012, Pranay Patel, M.D., performed a consultative examination of the plaintiff at the Commissioner's request. The plaintiff reported chronic low back pain preventing her from standing more than 15 minutes at one time or sitting more than about 30 minutes. She reported the maximum time she can lay down is four to five hours and that even doing things at home cause her to need frequent breaks. The plaintiff reported ongoing trouble with diabetes and not being able to tolerate many medications. The plaintiff reported anxiety and depression with panic attacks and feeling stressed because of her illnesses. The plaintiff reported other chronic problems including hypertension, atrial fibrillation, and bilateral foot pain. The plaintiff indicated that she has a hard time walking distances when her feet problems flare up. Dr. Patel noted that the plaintiff had a pacemaker, insomnia, chronic diarrhea, rotator cuff tear, and obesity. Dr. Patel noted that the plaintiff was 64 inches tall and weighed 259 pounds making her BMI 44.45. The plaintiff had decreased sensation in her ankle and foot areas, and ankle jerks were absent. Dr. Patel indicated that the plaintiff's ability to squat was slightly limited due to her weight and back pain. The plaintiff's individual leg raise, bilateral leg raise, and bending were all restricted to 10 to 15 degrees because of weight and subjective pain. Dr. Patel diagnosed chronic lower back pain, diabetes type 2, history of pacemaker x3, anxiety and depression, benign hypertension, atrial fibrillation, Achilles tendinitis with good range of motion at the moment, and obesity. Dr. Patel indicated that the plaintiff had multiple problems, but, "[a]ccording to her, her main problem seemed to be her back pain." He felt that the plaintiff's diabetes could be controlled, and her anxiety and depression could be controlled

12

if her back pain and sugars were better controlled. Dr. Patel noted that weight loss would help the plaintiff's tendinitis and diabetes. He stated that he had no x-ray reports to see how bad the plaintiff's back was and that the plaintiff could not get an MRI because of her pacemaker. Dr. Patel indicated that it was unknown if epidural injections would help or not. He stated, "She is able to do a whole lot of activities, but needs frequent breaks, is mostly working long hours and sitting and standing for long, which gives her trouble" (Tr. 429-32).

At her March 26, 2012 follow up for diabetes with Kim A. Pickett, A.P.R.N., the plaintiff complained of fatigue, diarrhea, back pain, and numbness and tingling in her feet (Tr. 570). The plaintiff's musculoskeletal and neurological examinations were normal (Tr. 570-71), and Ms. Pickett did not conduct an abdominal examination. Ms. Pickett indicated that the plaintiff's glucometer readings showed the plaintiff's blood sugar to be 67% over target. The plaintiff reported difficulty affording test strips. Ms. Pickett noted that the plaintiff had been denied disability and had no medical insurance. The plaintiff was prescribed gabapentin for her neuropathic pain and given samples of glucose test strips (Tr. 568-72).

On March 29, 2012, Carl Anderson, M.D., a state agency physician, reviewed the plaintiff's medical records and Dr. Patel's report and completed a physical residual functional capacity ("RFC") assessment (Tr. 103-05). Dr. Anderson opined that the plaintiff remained able to perform medium work, with frequent climbing ramps and stairs, balancing, stooping, kneeling, and crouching, and occasional crawling, but no climbing ladders, ropes and scaffolds (Tr. 103-04). He further opined that the plaintiff could engage in frequent overhead reaching on the left and that she must avoid concentrated exposure to fumes and hazards (Tr. 105). Additionally, he explained that the plaintiff's gastrointestinal problems were not severe (*id.*). On May 4, 2012, Dale Van Slooten, M.D., a second state agency physician, affirmed Dr. Anderson's findings (Tr. 115-18).

13

The plaintiff saw Dr. Nash again on August 14, 2012 (Tr. 585). She complained of right-sided upper back pain (*id.*). On examination, the plaintiff was tender/tight through her right mid-thoracic musculature with kyphosis (Tr. 587). Her arm strength and sensation were normal. Dr. Nash prescribed Flexeril and stretches for her pain (*id.*).

On September 26, 2012, Dr. Gault evaluated the plaintiff for continued high blood sugar levels. The plaintiff complained of chronic back pain. Dr. Gault increased the dose of the plaintiff's diabetic medication (Tr. 594-97).

On December 3, 2012, the plaintiff saw Ms. Johnson and complained of tailbone pain from a fall six months prior. She said she did not seek treatment because she did not think there was anything to be done for the pain. The plaintiff reported that her pain had worsened and that it was intolerable when sitting for prolonged periods of time. She said it was worse when getting up from a seated position. The plaintiff reported "pins and needles" and indicated that she was unable to do things such as make dinner without taking several breaks. Ms. Johnson noted that the plaintiff was unable to lift much weight because of her shoulder and had limited range of motion. Ms. Johnson noted that the plaintiff had been unable to see their practice for a year and a half due to insurance issues but was resuming care since her husband obtained insurance. Ms. Johnson noted that Dr. Nash had encouraged the plaintiff to apply for disability, and the plaintiff was in the process of doing that. The plaintiff also complained of frequent diarrhea and claimed that a gastrointestinal specialist diagnosed irritable bowel syndrome ("IBS") (Tr. 603). The plaintiff reported that she was having frequent diarrhea flares – she claimed that four days out of the week she had loose stools every 15 minutes all throughout the day. Ms. Johnson noted that the plaintiff's depression had not improved much and that she had crying spells, low energy/motivation, and often did not want to get out of bed. On examination, the plaintiff's right shoulder range of motion was decreased, and although she had pain with extension,

14

she had no swelling or deformity. The plaintiff was very obese, weighing 262 pounds (Tr. 604). She had paraspinal lumbar tenderness and a negative straight leg raising test. Her gait was slow. Ms. Johnson prescribed Celebrex and Lortab for her pack pain and advised her to use a wedge pillow for her tailbone pain (*id.*). Ms. Johnson ordered lumbar spine x-rays (Tr. 601-02).

On January 10, 2013, Ms. Johnson completed a questionnaire (Tr. 599-600), and indicated that the plaintiff could not perform even sedentary work. Ms. Johnson explained that prolonged standing or sitting would aggravate the plaintiff's back pain. Ms. Johnson also explained that the plaintiff often had diarrhea 12 or more times a day. Ms. Johnson indicated that the plaintiff could not lift due to her shoulder problems and had a history of rotator cuff impingement. Ms. Johnson indicated that the plaintiff was capable of engaging in work that involved more than basic one and two step processes. She indicated that the plaintiff's diagnoses causing her impairments were 722.52 (lumbar degenerative disc disease), 719.41 (shoulder joint pain), and 564.1 (irritable bowel syndrome) (Tr. 599). She further stated that the plaintiff's complaints of pain and gastrointestinal distress were "well-documented over the past several years" and that the plaintiff had seen "multiple specialists" without much improvement (*id.*). Ms. Johnson stated that the plaintiff had been impaired since "2009, as documented by our office. She complained of intermittent low back pain for 30 years" (Tr. 599-600).

The plaintiff submitted the following evidence to the Appeal Council, which was incorporated into the administrative record (Tr. 5):

1) On April 14, 2013, Ms. Johnson and her colleague, Thomas Ballard, M.D., jointly submitted a letter stating that they had treated the plaintiff from 2009-2011 and most recently saw her in February 2013 (Tr. 606). The letter stated that the plaintiff consistently presented with complaints of back and shoulder pain, that her gait was slow, and that she had difficulty moving around. The letter also stated that, on examination, the plaintiff

15

consistently presented with a limited range of motion with flexion and muscle spasm in her low back.  The letter further explained that the plaintiff was limited in the types of back pain medication she could take due to her "gastrointestinal issues" (*id.*).  The letter concluded that, based on her history and presentation, the plaintiff's back and shoulder pain would limit her to no more than sedentary work as that term is defined in the questionnaire that Ms. Johnson previously filled out (Tr. 599, 606).  The letter then stated that the plaintiff's gastrointestinal problems would significantly interfere with her ability to work at even a sedentary job because she would need to take frequent breaks (*id.*).  It was explained that the plaintiff had frequent and urgent bouts of diarrhea that would cause her to be away from the work station very frequently throughout the work day.  They stated, "Because these breaks would be unpredictable and quite frequent, it is most probable she would not be able to complete even simple tasks in a timely manner."  They indicated that the plaintiff also suffered from diabetes, but that her blood sugar had been under good control. They also stated, "Some of her pain could be neuropathic, but I suspect it is largely related to her back arthritis" (Tr. 606).

2) On September 20, 2013, Dr. Rodriguez wrote a letter to the plaintiff's counsel stating that the plaintiff had "very bad spondylosis and severe back pain" (Tr. 607). Dr. Rodriguez indicated that they were doing further work-up with a CT scan, would probably get her radio frequency ablation to possibly curb her pain, and that "at this point" he did not see any way that she could hold a normal job (*id.*).  Dr. Rodriguez noted that even sitting for extended periods of time causes severe pain, she has to get up every 30 minutes, and  "standing she cannot do at all, anything more than 30 minutes as well."  Dr. Rodriguez indicated that the only thing the plaintiff could "maybe do is sedentary where she could get regular breaks every 30 minutes."  He noted that the plaintiff had a second issue of diarrhea that is chronic and that the plaintiff stated this could "take her out of commission

for days at a time, so this would further limit her." Dr. Rodriquez stated, "At this point I would agree that she cannot do any sedentary or standing job" (Tr. 607).

3) On November 22, 2013, Matthew Terzella, M.D., of Orthopedic Specialties of Spartanburg wrote a letter after first examining the plaintiff on November 6, 2013 (more than four months after the ALJ's decision), stating that "at this point" the plaintiff could not hold a "normal job" (Tr. 608). He also filled out the same questionnaire that Ms. Johnson previously filled out and opined that the plaintiff could not perform sedentary work on a sustained basis (Tr. 609-10). He opined that prolonged sitting, standing, and walking caused the plaintiff significant pain, and she has to change positions at least every 20 to 30 minutes. Dr. Terzella explained that sedentary work on a limited basis is what would be most appropriate. He clarified that "limited basis" would mean 15 to 20 minutes, requiring a break afterwards. He indicated that standing was very difficult as well and recommended that the plaintiff not stand for any length of time. Dr. Terzella stated, "To sum up, I agree with Dr. Rodriguez that I think the only thing she could possibly do as far as employment would be strictly sedentary with requisite breaks every 20 to 30 minutes." Dr. Terzella indicated that the plaintiff also had a history of diarrhea that appeared to be chronic as well. He stated, "This is something that would have to be considered, especially when being employed regularly in the work force. I feel that this may limit her even further." Dr. Terzella also indicated that the plaintiff had low back pain for years, but it had been progressing since 2005. He stated, "She has made an outstanding attempt to deal with this in many ways, shapes and forms. She has continued to try to work a 'regular' job despite her pain. At this juncture it appears that it is not feasible for her to continue in that capacity." (Tr. 608).

4) Dr. Terzella also completed a questionnaire indicating that if the plaintiff attempted to work on an eight-hour day, five day a week basis, she would not be able to engage in anything more than sedentary work "on a limited basis." He explained that the

17

plaintiff needed breaks every 20 to 30 minutes to relieve her pain, and she could not do sedentary work on a sustained basis. Dr. Terzella indicated that the plaintiff's diagnosis causing these limitations were low back pain and severe lumbar spondylosis (arthropathy). Dr. Terzella indicated that the plaintiff had pain for years but it "has been worsening since 2005" (Tr. 609-10). Dr. Terzella further noted that the plaintiff's chronic diarrhea "would have to be considered" and "may limit her even further" (Tr. 608).

## ANALYSIS

The plaintiff argues that the ALJ erred by failing to conduct an accurate RFC assessment (pl. brief at 17-21). She further argues that new evidence submitted to the Appeals Council might have affected the Commissioner's decision and requires remand (*id.* at 21-25).

### *Residual Functional Capacity*

The plaintiff first argues that the ALJ's RFC finding is not supported by substantial evidence. Social Security Ruling ("SSR") 96-8p provides in pertinent part:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

SSR 96-8p, 1996 WL 374184, at *1. The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

18

*Id.* at *7 (footnote omitted). Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Moreover, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

The plaintiff specifically argues that the ALJ failed to properly consider her chronic diarrhea in the RFC analysis. The undersigned agrees. The ALJ acknowledged that the plaintiff had chronic diarrhea but found this impairment was one of several medically determinable impairments that "are generally medically controlled and would not cause more than a minimal impact on work related activities" (Tr. 18). The ALJ noted that Ms. Johnson, a physician's assistant, stated that the plaintiff's "colonoscopies had been normal, and there had been no etiology found for such a problem. Ms. Johnson stated 'maybe thought to be IBS-D'" (Tr. 321)). However, the plaintiff does not dispute that her last colonoscopy in 2007 was normal but instead argues that the relevant question is whether her diarrhea exists, not whether the cause has been determined (pl. reply at 2). Ms. Johnson does not appear to have questioned that the plaintiff had chronic diarrhea (Tr. 322) and stated that she suspected the plaintiff might have IBS-D (Tr. 321). A normal colonoscopy is one of the criteria for diagnoses of IBS. *See* http://www.mayoclinic.org/diseases-conditions/irritable-bowel-syndrome/basics/tests-diagnosis/CON-20024578 (last visited 10/23/15). Further, nurse practitioner Gottschalk indicated that metformin had caused the plaintiff to have severe diarrhea (Tr. 288), which would not involve any abnormalities on colonoscopy. While the Commissioner also notes that the plaintiff had "several normal abdominal examinations throughout the relevant period" (def. brief at 11), as noted above with regard to normal colonoscopies, Ms. Johnson suspected IBS-D, and "there are usually no physical signs to dianose IBS; diagnosis is often a process of ruling out other conditions." http://www.mayoclinic.org/diseases-conditions/irritable-bowel-syndrome/basics/tests-dia

19

gnosis/CON-20024578.  The Rome III criteria, which are symptom-based criteria for the diagnosis of IBS, are considered reliable only when "results from a physical examination and any tests are negative.  They appear normal."  http://www.aboutibs.org/site/signs-symptoms/diagnosis (last visited 10/23/15).

The plaintiff testified that her chronic diarrhea affects how she spends her days. At the hearing, she indicated that she was unable to leave her house the prior Friday through Monday because it was so severe. The plaintiff stated, "That's not a sick thing, that's an everyday thing." She also testified that when she was working she would "miss 2 or 3 days in a row due to that issue" (Tr. 38).  The ALJ acknowledged this testimony in the RFC analysis, stating, "She has chronic diarrhea every day and there are days when she cannot go out" (Tr. 21). The ALJ found the plaintiff's testimony to be "not entirely credible" (Tr. 21).  The ALJ discussed the plaintiff's shoulder treatment, cardiac treatment, and back pain treatment (Tr. 21-22), as well as the plaintiff's activities, Dr. Patel's consultative examination findings, Ms. Johnson's opinions, and the opinions of the non-examining state agency physicians (Tr. 23-24).  However, the only mention of the plaintiff's chronic diarrhea in the RFC analysis, besides the ALJ's acknowledgment of the plaintiff's testimony, was the ALJ's statement that Ms. Johnson noted in her January 2013 Medical Source Questionnaire that the plaintiff "has diarrhea 12 or more times a day" (Tr. 23 (citing Tr. 599-600)).  The Commissioner argues that the ALJ "appropriately explained in giving little weight to this opinion from Ms. Johnson – a non-acceptable medical source – this opinion was conclusory and not supported by any clinical findings" (def. brief at 12).  However, as noted above, the likely reasons cited in the record for the plaintiff's chronic diarrhea would not produce abnormal colonoscopies or abdominal examinations.

While the Commissioner argues that "the ALJ considered diarrhea in her residual functional capacity assessment and ultimate determination that there were no resulting functional limitations therefrom" (def. brief at 11), as discussed above, the ALJ actually dismissed the plaintiff's chronic diarrhea at Step 2 as a non-severe impairment and did not discuss this impairment later in the sequential evaluation process.  *See Robinson*

*v. Colvin*, No. 4:13-cv-823-DCN, 2014 WL 4954709, at *14 (D.S.C. Sept. 29, 2014) (citing *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (noting that if an ALJ commits error at step two, it is rendered harmless if "the ALJ considers all impairments, whether severe or not, at later steps")).

The Commissioner further argues, "With respect to Plaintiff's non-severe chronic diarrhea, the medical record simply evidences no effect on her ability to perform her past work in accounts receivable, tax, and as a billing clerk" (*id.* at 12). *See Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir.1984) ("An impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.") (citation omitted). The undersigned disagrees. For example, in her adult disability reports, the plaintiff indicated that she takes Lomotil for chronic diarrhea (Tr. 197, 218). In her function report dated January 9, 2012, the plaintiff stated, "I also have chronic diarrhea which sometimes limits my activity. I sometimes am unable to leave my home due to the diarrhea" (Tr. 222). On November 30, 2009, Dr. Rodriguez included "some diarrhea" in the plaintiff's review of systems (Tr. 286). On August 2, 2010, Ms. Johnson, evaluated the plaintiff and noted that she was having chronic diarrhea. Ms. Johnson diagnosed IBS and started the plaintiff on Lomotil (Tr. 326). On March 31, 2011, nurse practitioner Gottschalk indicated that metformin had caused the plaintiff to have severe diarrhea (Tr. 288). On May 13, 2011, Ms. Johnson indicated that the plaintiff had chronic diarrhea and was scheduled for a colonoscopy in 2011. The plaintiff reported to Ms. Johnson that she had to quit her last job because of missed work due to chronic, frequent diarrhea, which occurred several times a day. The plaintiff indicated that she avoided foods that tended to make her symptoms worse, but even still had symptoms at least twice weekly for several times a day. Ms. Johnson state that the plaintiff's colonoscopies had been normal with no etiology found, but it was thought the plaintiff might have diarrhea predominant IBS ("IBS-D") (Tr. 321). On October 14, 2011, Dr. Nash noted that the plaintiff complained of diarrhea (Tr. 493), and on March 13, 2012, Dr. Patel noted

21

a history of chronic diarrhea (Tr. 430). On March 26, 2012, Dr. Nash's nurse practitioner noted that the plaintiff had complaints of diarrhea (Tr. 570), and on December 3, 2012, Ms. Johnson noted that the plaintiff was having diarrhea (Tr. 604).

Based upon the foregoing, substantial evidence does not support the ALJ's finding that the plaintiff's chronic diarrhea was a non-severe impairment.  Moreover, the ALJ's finding is not harmless error as she failed to properly consider the evidence and testimony regarding the plaintiff's chronic diarrhea in the RFC analysis.  *See Robinson,*, 2014 WL 4954709, at *14.  Accordingly, upon remand, the ALJ should be instructed to consider all of the plaintiff's impairments, including the plaintiff's chronic diarrhea, in the RFC analysis.

### Appeals Council Evidence

The plaintiff next argues that the new evidence submitted to the Appeals Council might have affected the Commissioner's decision.  The plaintiff relies on *Meyer v. Astrue*, 662 F.3d 700 (4th Cir. 2011), arguing that the first-time opinions from three treating physicians requires remand because there were no treating physician's opinions in the record before the ALJ, and, accordingly, the new evidence has not been reconciled with the prior evidence in this case (pl. brief at 21-25).  The undersigned agrees.

The ALJ in *Meyer* issued a decision denying benefits and noted that Meyer failed to provide an opinion from his treating physician.  662 F.3d at 702.  When Meyer requested review of his claim by the Appeals Council, he submitted a letter from a physician detailing the injuries (from a fall) and noting significant restrictions on Meyer's activity.  The Appeals Council summarily denied review but made the letter part of the administrative record.  The Magistrate Judge in *Meyer* recommended that the Commissioner's decision be affirmed because the doctor who authored the report was not a treating physician and thus the report should be accorded only minimal weight, and the district court adopted the Report and Recommendation.  *Id.* at 704. The Court of Appeals, however, determined that the doctor was in fact a treating physician, the report submitted to the Appeals Council was the only report in the record from a treating physician, and the report constituted new and

material evidence. *Id*. at 705.  The court stated that when the Appeals Council receives additional evidence and denies review, the issue for the court is whether the ALJ's decision is supported by substantial evidence. *Id*. at 707. The court remanded for additional fact finding to reconcile conflicts between the newly submitted evidence and the evidence the ALJ had considered.  *Id.* The court noted that the treating physician's opinion corroborated the opinion of an evaluating physician, which had been rejected by the ALJ, but other record evidence credited by the ALJ conflicted with the new evidence.  *Id.*  The court concluded: "Thus, no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record. Assessing the probative value of competing evidence is quintessentially the role of the fact finder. We cannot undertake it in the first instance."  *Id.*  Accordingly, the case was remanded.

As set forth more fully above, following the ALJ's decision, the plaintiff submitted the following opinions to the Appeals Council, which were made part of the record: a second medical source statement from Ms. Johnson (co-signed by Dr. Ballard), dated April 4, 2013, in which they opined that the plaintiff could perform sedentary work, but that her gastrointestinal problems would interfere with her ability to perform sedentary work because she would need to take frequent breaks (Tr. 606); a September 20, 2013, letter from Dr. Rodriguez stating that "at this point," he did not see any way that the plaintiff could hold a normal job due as sitting for extended periods caused severe pain, and she had a "second issue" of chronic diarrhea (Tr. 607); and a November 22, 2013, letter and statement from Dr. Terzella, after he first examined the plaintiff on November 6, 2013, stating that the "only thing she could possibly do as far as employment would be strictly sedentary with requisite breaks every 20 to 30 minutes," and her chronic diarrhea "would have to be considered" and "may limit her even further" (Tr. 608-10).

The Commissioner argues that the ALJ "considered a multitude of opinion evidence, including opinions from two state agency physicians, a consultative examiner, and Ms. Johnson, a treating source" (def. brief at 16  n.3), and substantial evidence

supports the ALJ's decision. However, the opinion from Ms. Johnson was rejected by the ALJ because she was not "acceptable medical source" (Tr. 23), and, as in *Meyer*, the ALJ did not have the opinion of a treating physician before her.  Further, while the ALJ did consider the opinion of Dr. Van Slooten, a state agency physician who opined the plaintiff could perform medium work, the ALJ gave the opinion "little weight" (Tr. 23).  The ALJ also considered the opinion of consultative examiner Dr. Patel, who opined the plaintiff "was capable of doing a lot of activities but needed frequent breaks," but the ALJ also discounted that opinion (Tr. 23 (citing Tr. 429-32)).  Here, as in *Meyer*, "no fact finder has made any findings as to the treating physician's opinion[s] or attempted to reconcile that evidence with the conflicting and supporting evidence in the record."  662 F.3d at 707.  Accordingly, the undersigned further recommends that, upon remand, the ALJ be instructed to consider all of the evidence of record in making her findings, including the opinions submitted to the Appeals Council and discussed above.

### CONCLUSION AND RECOMMENDATION

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

October 26, 2015
Greenville, South Carolina

24